BRISCOE, Circuit Judge,
dissenting.
I respectfully dissent. While I agree that the “main issue before us is whether NAHASDA is clear and unambiguous such that we should not giant Chevron deference to the implementing regulations,” Maj. Op. at 1239, I read NAHASDA as a whole to be ambiguous in its references to tribal jurisdiction when addressing requirements a tribe must satisfy in order to receive funding. Accordingly, I would apply Chevron deference and consider HUD’s regulations and their present application. Based on this analysis, I would affirm.
I
The majority’s statutory construction analysis begins and ends with the plain language of 25 U.S.C. § 4152(b). Maj. Op. at 1241 (“Section 4152(b) states that ‘the formula shall be based on factors that reflect the need, of the Indian tribes and the *1247 Indian areas of the tribes for assistance for affordable housing activities.’ This language explicitly and unambiguously mandates that the factors in HUD’s allocation formula reflect ... the need of Indian tribes and Indian areas of the tribes.”) (citation omitted). In my view, this approach ignores an important canon of statutory construction. Following the guidance of the Supreme Court, this Circuit has repeatedly noted the need to consider statutory language in the “broader context of the statute as a whole.” E.g., In re Wise, 346 F.3d 1239, 1241 (10th Cir.2003) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) for the statement, “The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.”); Sierra Club v. El Paso Gold Mines, Inc., 421 F.3d 1133, 1143 (10th Cir.2005) (citing United States v. Nichols, 184 F.3d 1169, 1171 (10th Cir.1999) for the assertion that “appellate courts must examine the ... language in context, not in isolation”); Wyoming v. United States, 279 F.3d 1214, 1230 (10th Cir.2002) (quoting Gade v. Nat’l Solid Wastes Mgmt. Ass’n, 505 U.S. 88, 99, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) for the statement, “We must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law.”); Osborne v. Babbitt, 61 F.3d 810, 812 (10th Cir.1995) (“In determining the meaning of a statute, we look at not only the statute itself but also at the larger statutory context.”). To examine § 4152(b)’s need requirement in the broader context of NAHASDA as a whole, it is necessary to review the NAHASDA framework.
Under the NAHASDA framework, Congress delegated to HUD authority to make housing grants “on behalf of Indian tribes to carry out affordable housing activities.” 25 U.S.C. § 4111(a). HUD may make a grant under NAHASDA only if the Indian tribe submits a qualifying “Indian housing plan for such fiscal year.” Id. § 4111(b)(l)(A)-(B). Every housing plan an Indian tribe submits to HUD “shall contain” “a general statement of the mission of the Indian tribe to serve the needs of the low-income families in the jurisdiction of the Indian tribe during the period!,]” “a statement of the goals and objectives of the Indian tribe to enable the tribe to serve the needs [of the low-income families in the jurisdiction of the Indian tribe]” and “a statement of the housing needs of the low-income Indian families residing in the jurisdiction of the Indian tribe and the means by which such needs will be addressed during the period, including ... a description of the estimated housing needs and the need for assistance for the low-income Indian families in the jurisdiction ... and ... a description of the estimated housing needs for all Indian families in the jurisdiction.” 25 U.S.C. § 4112(b)(l)-(2), (e)(2)(A)-(B) (emphasis added).[1] Upon receiving the plans, “[HUD] shall conduct a limited review of *1248 each Indian housing plan submitted to [HUD] to ensure that the plan complies with the requirements of section 4112.... [HUD] shall have the discretion to review a plan only to the extent that [HUD] considers review is necessary.” 25 U.S.C. § 4113(a)(1). For “Indian tribes that comply with the requirements under [NA-HASDA] for a grant under [NAHASDA],” HUD allocates funding “in accordance with the formula established pursuant to section 4152 ...” 25 U.S.C. § 4151.
Under this framework, before an Indian tribe can receive NAHASDA funding, the tribe must submit a statement of the housing needs in the tribe’s jurisdiction. This requirement ties a tribe’s receipt of NA-HASDA funding to its description of housing needs in the tribe’s jurisdiction. At minimum, it is ambiguous whether a tribe must have jurisdiction over an area before it can estimate and seek funding for its housing needs.
The majority disputes this ambiguity by reasoning that “rather than suggesting that § 4152 is ambiguous, the inclusion of the ‘jurisdiction’ language in § 4112(c) demonstrates that Congress explicitly left jurisdiction out of the need-based formula under § 4152.” Maj. Op. at 1243. To me, this logic is unconvincing.[2] Simply put, Congress could not have “explicitly” left jurisdiction out of the “formula under § 4152” because Congress did not explicitly create a formula under § 4152. Indeed, to state that there is a “formula under § 4152” is itself a misnomer because there is no formula in § 4152. In § 4152, Congress delegates to HUD the responsibility to “establish a formula ... in accordance with the requirements of this section.” 25 U.S.C. § 4152(a). “The requirements of this section” identify that “[t]he formula shall be based on factors that reflect the need of the Indian tribes and the Indian areas of the tribes for assistance for affordable housing activities....” Id. § 4152(b). Given this statutory language, it strains reason to conclude that a delegation of authority to create a formula based on “factors that reflect” need of the Indian areas implies that Congress explicitly omitted a jurisdiction requirement from that formula.
Similarly, the majority’s rephrased conclusion—“Because Congress demonstrated its awareness of the jurisdictional element in one section of the statute, it is clear that it could have allowed for court jurisdiction in another section of the statute if it had wished to do so,” Maj. Op. at 1243-44—highlights several contradictions in *1249 the majority’s analysis. First, this statement considers NAHASDA to be one statute, reinforcing the need to consider § 4152 in its broader context. Second, the statement acknowledges there is a jurisdictional element to NAHASDA. The holding of the majority, however, is that NAHASDA unambiguously forecloses any jurisdictional requirements in the funding formula. Third, this conclusion contradicts the language of the statute, which establishes a juxisdictional element as a necessary precondition before any funding can be allocated under § 4151, according to the formula established pursuant to § 4152. Because the jurisdictional element is a necessary precondition to applying § 4152, it arguably would be superfluous for Congress to again include the same requirement in § 4152.
The ambiguous jurisdiction requirement in § 4112 also supplies a necessary geographic boundary for NAHASDA funding. The majority does not identify what geographic boundaries would be used in determining where an Indian tribe can provide housing assistance. The majority only concedes that § 4152(b)’s need requirement relates to the “Indian areas of the tribes.” Maj. Op. at 1241-42. After applying the statutory definition of “Indian area,” the majority determines that “all that the use of the term ‘Indian area’ in § 4152(b) indicates is that HUD must take into consideration the need of the area in which the applicant Indian tribe provides housing assistance.... ” Id. at 1242. Under this construction, HUD should provide housing assistance funding only for areas where Indian tribes provide housing assistance and there is need for housing assistance funding. This approach appears circular, if not meaningless; nothing would prevent an Indian tribe from randomly expanding its “Indian area” to include areas in need wherever located.
Additionally, the majority disregards the element of the “Indian area” definition that requires the housing assistance to be provided under NAHASDA. 25 U.S.C. § 4103(10) (“The term ‘Indian area’ means the area within which an Indian tribe ... provides assistance under this Act for affordable housing.”) (emphasis added). To receive funds to provide assistance under NAHASDA, the tribe must comply with NAHASDA’s requirements. Id. § 4151. One of NAHASDA’s requirements is to submit a housing plan describing the needs, and goals to serve the needs, of the tribe’s jurisdiction. Id. § 4112. Neither the majority, nor NAHASDA’s plain language, suggests how a tribe would receive funding for an area outside its jurisdiction, and consequently not described in its qualifying housing plan. If a tribe does not receive funding for an area outside of its jurisdiction, then arguably it does not provide housing assistance under NAHASDA for that area. If it does not provide housing assistance under NAHASDA for that area, then that area is not within the tribe’s “Indian area.” Consequently, for the majority’s holding—that NAHASDA’s use of “Indian area” unambiguously does not include a jurisdictional element—to be tenable, one must assume, without a statutory basis, that HUD provides funding for areas that are not required to be described in a tribe’s qualifying housing plan.
On the other hand, because § 4112 requires a tribe to describe its housing needs in its jurisdiction and also requires a tribe to describe how it will address those needs in its jurisdiction, it is reasonable to assume that the Indian tribe must provide housing assistance in its jurisdiction.[3] *1250 Consequently, at least part of an Indian tribe’s “Indian area”—defined to be “the area within which an Indian tribe ... provides assistance under [NAHASDA] for affordable housing,” 25 U.S.C. § 4103(10)—must include the tribe’s jurisdiction.[4] Because § 4152 requires the allocation formula to be based on factors that reflect “the need ... of the Indian areas of the tribes,” the allocation formula is ambiguous about w'hether that need must be within an Indian tribe’s jurisdiction. At a minimum, § 4112’s repeated references to need within a tribe’s jurisdiction directly refutes the majority’s assertion that “we can find no discernible nexus between the requirement that the Indian tribes exercise court jurisdiction over some geographic area and the ‘need’ of the tribes.... ” Maj. Op. at 1244.
Ultimately, NAHASDA’s plain language requires a description of the needs of the tribes’ jurisdictions in their submitted housing plans and consideration of factors reflecting the need of the Indian areas under its allocation formula. In my view, this situation is similar to Kansas v. United States, 249 F.3d 1213 (10th Cir.2001). In Kansas, we reviewed a statute that defined “Indian lands” as “any lands ... over which an Indian tribe exercises governmental power,” but separately required the tribe to exercise jurisdiction. Kansas, 249 F.3d at 1228 (citing 25 U.S.C. § 2703(4)(B), 2710(b)(1)). When reviewing the agency’s decision in Kansas, we addressed the distinction between governmental power over land and jurisdiction over land. Id. at 1229. We stated, “We agree ... that before a sovereign may exercise governmental power over land, the sovereign, in its sovereign capacity, must have jurisdiction over that land.”[5] Id. By requiring jurisdiction in some parts of the statute, but not including jurisdiction as part of the “Indian areas” definition, I similarly view' NAHAS-DA as ambiguous regarding whether its jurisdictional references require a tribe to exercise jurisdiction over land before it can receive funding for housing assistance. See id. (noting that the statute at issue “shed[ ] little light on the question” and finding that “Congress ha[d] not directly spoken to the precise question at issue”) (quotation omitted). Because I consider NAHASDA to be ambiguous on this issue, I w'ould apply Chevron deference to HUD’s statutory interpretations.[6]
*1251 II
A. HUD’s interpretation of NAHASDA
Having determined that NAHASDA is ambiguous regarding whether a tribe’s jurisdiction is a consideration for IHBG funding, I next would consider whether HUD’s interpretation is permissible. Wedelstedt v. Wiley, 477 F.3d 1160, 1165 (10th Cir.2007) (“If the statutory scheme involves an ambiguity or silence on the precise question at issue, however, we must next consider whether the agency’s interpretation is permissible.”). “If Congress has explicitly or implicitly delegated authority to an agency, legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.” Nutraceutical Corp. v. Von Eschenbach, 459 F.3d 1033, 1038 (10th Cir.2006) (quotation omitted); Newton v. F.A.A., 457 F.3d 1133, 1136 (10th Cir.2006) (“[W]e ordinarily defer to an agency’s interpretation of an ambiguous statute that it implements.”).
HUD’s application of the regulations at issue, 24 C.F.R. § 1000.302 and 1000.324, considers a tribe’s ability to exercise jurisdiction over an area as part of the IHBG funding formula. As addressed above, I view NAHASDA’s inclusion of references to tribal jurisdiction in the funding formula as ambiguous. NAHASDA delegates to HUD to create other relevant factors for the IHBG funding formula. 25 U.S.C. § 4152(b)(3) (“Other objectively measurable conditions as the Secretary and the Indian tribes may specify.”). By identifying a formula area as limited by a tribe’s jurisdiction, the formula area is objectively measurable and is relevant to other portions of the statute that require “Indian areas.” 25 U.S.C. § 4103(10). In my view, HUD’s regulation requiring the tribe to have jurisdiction over an area is a permissible addition, if not a necessary starting point, in identifying a tribe’s housing needs and meeting the statutory requirement of providing housing assistance. Because HUD’s construction of the statute is permissible, I would defer to its interpretation.
B. HUD’s Action
Because I would defer to HUD’s interpretation of NAHASDA, I also would consider HUD’s actions under its regulations. Review of HUD’s final agency action is controlled by the APA, which states in pertinent part:
To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.
5 U.S.C. § 706(2)(A); see Via Christ: Reg’l Med. Ctr., Inc. v. Leavitt, 509 F.3d 1259, 1271 (10th Cir.2007) (applying this standard). Under the arbitrary and capricious standard of review, “review is narrow and deferential; we must uphold the agency’s action if it has articulated a rational basis *1252 for the decision and has considered relevant factors.” Nutraceutical Corp., 459 F.3d at 1038 (quotation omitted).
1. HUD’s interpretation of its regulations
The UKB argues that HUD acted arbitrarily and capriciously. First, the UKB contends that HUD’s interpretation of its regulations to include a jurisdictional requirement in the funding formula contradicts the clear language of NAHASDA and HUD’s regulations. I disagree. Because Chevron is applicable and I would defer to HUD’s permissible interpretation of NA-HASDA, I also would give substantial deference to HUD’s interpretation of its own regulations. See Leavitt, 509 F.3d at 1272 (“[W]e must give substantial deference to an agency’s interpretation of its own regulations.”) (quotation omitted).
The UKB contends that the “plain language of NAHASDA and its implementing regulations do not require the designation of a formula area and the exercise of jurisdiction over a geographic area....” Aplt, Br. at 15 (emphasis omitted). Because I would conclude that NAHASDA is ambiguous on this issue, I would confine my present review to HUD’s regulations. Under 24 C.F.R. § 1000.310, “[t]he IHBG formula consists of two components: (a) Formula Current Assisted Housing Stock (FCAS); and (b) Need.” Both parties agree that only the need component is presently at issue. The need component consists of seven criteria addressing households in need. 24 C.F.R. § 1000.324. Absent from these criteria is a fixed boundary within which one could determine the number of households that satisfy the need criteria. I consider HUD’s reference to the “formula area” definition found in 24 C.F.R. § 1000.302 to be appropriate, and likely necessary, to calculate the number of relevant households. I would defer to HUD’s interpretation of its regulations to read “formula area” in 24 C.F.R. § 1000.302 as the area relevant for the formula tabulations.
2. Similarly-Situated Tribes
The UKB also contends that HUD’s action is arbitrary and capricious because it treats similarly-situated tribes differently. To support this argument, the UKB contends:
In the same year that HUD denied IHBG funding to the [UKB] ..., HUD granted funding to the Pamunkey Tribe, the Lumbee Tribe, the Poospatuek Indians and the Waccamaw Siouan State Tribe. (Aplt.App[’x][ ]229). These state tribal entities lack the legal capacity to exercise jurisdiction over land and are not qualified to have lands held in trust by the federal government.
Aplt. Br. at 18-19. The UKB also highlights HUD’s acknowledgment of the possibility of similar tribes-—“since there may be other landless tribes, we need to understand the implications of any decision that is made in this case on other tribes”—and contends that because the record does not otherwise consider the implications of its decision on other tribes, HUD ignored this aspect of the analysis. Id. at 19 (quoting Aplt. App’x at 72).
The record citation provided by the UKB to support the existence of similarly-situated tribes refers only to a letter through counsel from the UKB to HUD disputing UKB’s jurisdiction over a formula area. Assuming that this is appropriate authority, I would read the letter to state that HUD provided IHBG need funding to the referenced tribes because they met the formula area definition under 24 C.F.R. § 1000.302 (viii). Aplt. App’x at 229. To the extent the UKB did not meet the formula area definition, the referenced tribes are not similarly situated.
I also would reject the UKB’s contention that HUD failed to consider the impact on *1253 other similar tribes. As the UKB noted, HUD acknowledged the potential impact on other similar tribes as a consideration. HUD later indicated that the UKB was not the only tribe affected by the Cherokee Nation’s contention that only it could exercise jurisdiction over the Cherokee Oklahoma Tribal Statistical Area. Id. at 172. HUD identified the similarly-affected tribes as “the Shawnee Tribe ... and Delaware Tribe of Indians.” Id. According to HUD, the Delaware Tribe lost its federal recognition and was no longer eligible for IHBG funding, and the Shawnee Tribe did not appeal the decision. Id. at 172-73. In its letter to HUD, the UKB acknowledged that “[t]his situation is unique to these two tribes [the UKB and the Cherokee Nation] because they both are successors in interest to the former Cherokee Nation.” Id. at 234. Based upon these considerations, which HUD identified as a part of its decision-making process, I cannot conclude that HUD ignored or disregarded the implications of its UKB decision on other tribes.
3. HUD’s consideration of the Cherokee Nation’s Challenge
Under 24 C.F.R. § 1000.336(a), “An Indian tribe ... may challenge data used in the IHBG formula.” Because the regulations do not provide explicitly for a third party to challenge a tribe’s IHBG funding, the UKB contends HUD acted arbitrarily and capriciously by acting on the Cherokee Nation’s letter that requested a review of the formula area for other tribes in the Cherokee Nation’s jurisdictional area.
The majority expresses “grave concerns” that HUD permitted the Cherokee Nation to appeal absent an explicit regulation. Maj. Op. at 1246. I do not share these concerns. HUD considered the Cherokee Nation’s letter to be a challenge under 24 C.F.R. § 1000.336. Aplt. App’x at 25. As before, I would give substantial deference to HUD’s interpretation of its own regulations. Although the regulation does not reference explicitly the ability of one tribe to challenge the existence of another tribe’s formula area, this omission is similar to the absence of a formula area factor in the need formula in 24 C.F.R. § 1000.324. Just as the identification of the number of relevant households must necessarily be bound by a geographic boundary, census data relevant to those same households under the same need formula must also be confined by a geographic boundary. Despite the majority’s view that “this certainly was not a challenge to census data,” Maj. Op. at 1246, I would consider a challenge to the location or existence of such boundaries as a challenge to the number of people within those boundaries. In this regard, the Cherokee Nation’s letter challenged data used in the IHBG formula. Accordingly, I would defer to HUD’s application of 24 C.F.R. § 1000.336.
Relatedly, the UKB challenges HUD’s consideration of the Cherokee Nation’s appeal of HUD’s decision that the UKB satisfied the formula area requirement, The letter notifying the Cherokee Nation of this decision stated, “In accordance with 24 C.F.R. § 1000.336(b)(1) and 1000.118, you have the right to appeal this decision.” Aplt. App’x at 173. Section 1000.336(b)(1) provides in pertinent part:
In the event HUD challenges the validity of the submitted data, the Indian tribe ... and HUD shall attempt in good faith to resolve any discrepancies so that such data may be included in formula allocation. Should the Indian tribe ... and HUD be unable to resolve any discrepancy by the date of formula allocation, the dispute shall be carried forward to the next funding year and resolved in accordance with the dispute resolution procedures set forth in this part for model housing activities (§ 1000.118).
*1254 Section 1000.118 provides in pertinent part: “(a) Within thirty calendar days of receiving HUD’s denial of a proposal to provide assistance to non low-income Indian families or a model housing activity, the recipient may request reconsideration of the denial in writing. The request shall set forth justification for the reconsideration.”
The UKB contends that neither of these sections provides for “third party” appeals. Aplt. Br. at 22. Moreover, the UKB asserts that the Cherokee Nation did not file its appeal within the required thirty days. I would reject both arguments. HUD instructed the Cherokee Nation of its right to appeal under the cited regulations. Having concluded that HUD appropriately considered the Cherokee Nation’s letter as a challenge under § 1000.336, it would be illogical to conclude that the Cherokee Nation could not appeal an adverse determination under the same regulation. Further, I note that no relevant language in § 1000.336 limits who may bring a challenge or appeal beyond “An Indian tribe.” 24 C.F.R. § 1000.336(a), (b)(1). This regulation does not exclude third-party appeals or challenges by an Indian tribe, such as the Cherokee Nation. Regarding the thirty-day limit, HUD sent a letter notifying the Cherokee Nation of its right to appeal on October 18, 2005. Aplt. App’x at 172. The Cherokee Nation filed its appeal on November 16, 2005. Id. at 174. Consequently, I would conclude that the Cherokee Nation appealed “[wjithin thirty calendar days of receiving HUD’s denial,” satisfying 24 C.F.R. § 1000.118(a).
4. Nine years of precedent
The UKB raises several arguments based on the premise that HUD arbitrarily and capriciously disregarded nine years of precedent for providing the UKB IHBG funding. In my view, the UKB’s arguments disregard the explicit statutory language of NAHASDA. NAHASDA requires “an Indian tribe to submit to the Secretary, for each fiscal year, a housing plan under this section.” 25 U.S.C. § 4112(a)(1)(A). NAHASDA requires HUD to “conduct a limited review of each Indian housing plan.” 25 U.S.C. § 4113(a)(1). NAHASDA instructs HUD to “establish a formula to provide for allocating amounts available for a fiscal year for block grants.” 25 U.S.C. § 4152(a). By requiring annual submission and review of housing plans before allocating funding, the terms of NAHASDA necessarily reject the UKB’s reliance on nine years of prior funding as precedent for continued funding.
5. The UKB’s jurisdiction over lands within the former Cherokee reservation
Alternatively, the UKB asserts that HUD acted arbitrarily and capriciously by failing to consider that the UKB exercises jurisdiction over lands within the former Cherokee reservation. To support this argument, the UKB cites sources outside of the administrative record. I cannot conclude that HUD acted arbitrarily and capriciously because it failed to consider evidence that was not before it.[7] See Am. Mining Cong. v. Thomas, 772 F.2d 617, 626 (10th Cir.1985) (“[T]he agency’s action *1255 must be reviewed on the basis articulated by the agency and on the evidence and proceeding's before the agency at the time it acted.”).
6. Availability of Alternative Funding
The UKB argues that HUD acted arbitrarily and capriciously by failing to consider whether the designation of additional formula areas would be fair and equitable under 24 C.F.R. § 1000.302(2). The UKB’s entire argument on this issue is as follows: “In the present case, the administrative record establishes that HUD failed to consider IHBG funding in the [UKBJ’s proposed Formula Area as under 24 C.F.R. S 1000.302(2). Accordingly, HUD’s denial was arbitrary and capricious.” Aplt. Br. at 28. The UKB fails to clarify what IIUD failed to consider in the UKB’s Formula Response Form. In the absence of that clarification, I cannot conclude that HUD’s action was arbitrary and capricious.
Ill
I would affirm.

. I note that the majority’s description of the NAHASDA framework and the required housing plans states only, “NAHASDA established a housing-assistance program that was funded directly through Indian Housing Block Grants .. . and disbursed to tribes on the basis of Indian Housing Plans prepared by the tribes and submitted to HUD.’’ Maj. Op. at 1236-37 (citation omitted). The majority also cites Fort Peck Hous. Auth. v. U.S. Dep’t of Hous. & Urban Dev., 435 F.Supp.2d 1125, 1127-29 (D.Colo.2006) for a general description of NAHASDA’s funding mechanism. The description in Fort Peck, however, includes the requirement of a statement describing a tribe’s jurisdiction. 435 F.Supp.2d at 1128 (“NAHASDA provides that HUD shall make grants on behalf of Indian tribes to carry out affordable housing activities for each fiscal year from an appropriation for that year for *1248 tribes that have submitted an Indian housing plan, meeting general statutory requirements, including a statement of needs of low-income Indian families residing in the jurisdiction of the tribes.”).

. The majority appears to concede that there is a jurisdictional element to NAHASDA funding, but emphasizes the distinction of the "court jurisdiction” language in the regulations. Thus, in addition to reading § 4152's reference to "need” to be unambiguous, the majority apparently also considers § 4112's reference to “jurisdiction" to unambiguously exclude “court jurisdiction.” E.g., Maj. Op. at 1243 ("[TJhe reference to jurisdiction in its generic sense does nothing to suggest that HUD was free to impose a requirement of court jurisdiction."). I do not share the majority's certainty on this issue. See Black’s Law Dictionary (8th ed.2004) (defining jurisdiction as: “LA government’s general power to exercise authority over all persons and things within its territory ... 2. A court's power to decide a case or issue a decree. .. ."); Maj. Op. at 1241 ("We must assume that the ordinary meaning of the words Congress uses conveys its intent.”). I am also unconvinced by the majority's citation to 24 C.F.R. § 1000.10 for the regulatory definitions of "Indian area” and "jurisdiction.” Because the majority holds that NAHASDA is clear and unambiguous such that Chevron deference to HUD's regulations is inapplicable, it is contradictory to apply HUD’s regulations to conclude that NAHASDA is unambiguous.

. This statutory- requirement also makes the majority’s hypothetical scenario under the regulations irrelevant and likely impossible. See Maj. Op. at 1244. The majority postulates the existence of a “Tribe A” that "can claim no court jurisdiction of its own” but “provides substantial housing services” and *1250 “could get federal funding without having to show court jurisdiction at all.” Id. The majority fails to explain how Tribe A can submit a qualifying Indian housing plan under § 4112 that describes the low-income families and the housing needs of its non-existent jurisdiction. If Tribe A cannot submit such a housing plan, it would be ineligible for NAHASDA funding under 25 U.S.C. § 4111 (b)( 1 )(A)-(B).

. Under the plain language of the statute, it is conceivable that a tribe’s Indian area and its jurisdiction would not be identical. If a tribe did not provide housing assistance to a portion of its jurisdiction, then that portion of its jurisdiction would not be within its Indian area.

. I note that the majority also cites this statement, Maj. Op. at 1240 n. 5, but still concludes there is no connection between jurisdiction and a tribe's ability to provide housing assistance in its Indian area. Apparently, the majority does not consider providing housing assistance to be a governmental function requiring the exercise of governmental power.

.I w'ould also reject the UKB’s alternative argument that "[ejven if NAHASDA were ambiguous ... [wjhen Indian interests are involved, Chevron does not apply.” Aplt. Br. at 10. I agree that in cases reviewing statutes intended to benefit Native Americans, “the canon of [statutory] construction favoring Native Americans controls over the more general rule of deference to agency interpretations of ambiguous statutes." Ramah Navajo Chapter v. Lujan, 112 F.3d 1455, 1462 (10th Cir.1997). I would not, however, apply this canon of statutory construction in this context for two reasons. First, I do not concede the UKB's contention that requiring a tribe to exercise jurisdiction is detrimental to a tribe’s interests *1251 in providing housing services. Second, the canon of statutory construction favoring Native Americans is inapplicable when either reading of the statute would benefit Native Americans. Utah v. Babbitt, 53 F.3d 1145, 1150 (10th Cir.1995) ("We find this canon inapplicable here because the interests at stake both involve Native Americans."). Funding under NAHASDA is a finite amount, fixed annually. Each eligible tribe receives its funding as a portion of the available funding. Under this framework, there are Native American interests on both sides of the question of whether the statute ambiguously requires a tribe to exercise jurisdiction over land to be eligible for IHBG funding.

. The evidence that the UKB seeks to add to the administrative record is the affidavit of George Wickliffe, who is currently the Chief of the UKB. Aplt. App’x at 398. Mr. Wickliffe states that the UKB exercises exclusive jurisdiction over specific addresses in Oklahoma. This assertion does not indicate a factor that HUD failed to consider. To the contrary, HUD addressed whether the UKB exercised jurisdiction over lands within the former Cherokee reservation and relied on holdings from this court and letters from the BIA. Aplt. App'x at 25.