HI–TECH PHARMACEUTICALS, INC., Plaintiff,

v.

Lester M. CRAWFORD, D.V.M., PhD, as Commissioner of the United States Food and Drug Administration, United States Food and Drug Administration, Michael O. Leavitt, as Secretary of the Department of Health and Human Services, United States Department of Health and Human Services, Acting Commissioner Andrew C. Von Eschenbach, M.D., Defendants.

United States of America, Plaintiff,

v.

18 Cases, More or Less, Of An Article Of Food, Each Case Containing 120/100 Tablet Bottles, Labeled In Part Lipodrene Dietary Supplement 100 ct. Sida Cordifolia (leaves) (25mg ephedrine group alkaloids) Lot 05121004 Manufactured for Hi–Tech Pharmaceuticals, Inc. Norcross, GA, 174 Cases, More or Less, Of An Article Of Food, Each Case Containing 12/90 (OR 144/20) Tablet Bottles, Labeled In Part Stimerex–ES (Extra Strength with Ephedra) Dietary Supplement 90 (or 20) Tablets (Sida Cordifolia Extract) (leaves) (25mg ephedrine group alkaloids) Lot 0517502 Manufactured for Hi–Tech Pharmaceuticals, Inc. Norcross, GA, 20 Cases, More or Less, Of An Article Of Food, Each Case Containing 120/100 Tablet Bottles, Labeled In Part Betadrene Dietary Supplement 100 Ct. Sida Cordifolia Extract (leaves) (supplying 25mg Ephedrine Group Alkaloids) Lot 02122635 Manufactured for United Metabolic Research Group, Inc. Birmingham, AL 2 Previously Opened Cardboard Drums Of An Article Of Food, Bulk Dietary Supplement Ingredient, Labeled In Part Mahuang Extract 6% net Weight 25kgs Product of P.R. China Lot 20021119 (or 20021123), All Other Quantities Of The Aforesaid Articles Of Food, With Any Lot Number And In Any Size Or Type Container, That Are Labeled Or Otherwise Identified As Being Or Containing Ma Huang, Ephedra, Or Eph, Including Finished Products, In-Process Materials, and Raw Materials Used in the Manufacture of Such Finished Products by Hi–Tech Pharmaceuticals, Inc., 6015 and 6020 Unity Drive, Norcross, Georgia, Defendants.

Hi–Tech Pharmaceuticals, Inc., Claimant & Third-party plaintiff,

v.

United States of America, Third-party Defendant.

Civil Action Nos. 1:05–cv–02083–GET, 1:06–cv–00406–GET.

United States District Court, N.D. Georgia, Atlanta Division.

Aug. 15, 2007.

Edmund J. Novotny, Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., Atlanta, GA, Joseph Paul Schilleci, Jr., Timothy Melvin Fulmer, Natter & Fulmer, P.C., Birmingham, AL, for Hi–Tech Pharmaceuticals, Inc.

Stephen H. McClain, U.S. Attorney's Office, Atlanta, GA, for Lester M. Crawford D.V.M., Ph.D, as Commissioner of the United States Food and Drug Administration, United States Food and Drug Administration, Michael O. Leavitt as Secretary of the Department of Health and Human Services, United States Department of Health and Human Services, Acting Commissioner Andrew C. Von Eschenbach, M.D., United States of America.

Dahil Dueno Goss, Office of United States Attorney, Atlanta, GA, for United States of America.

### ORDER

G. ERNEST TIDWELL, District Judge.

The above-styled matter is presently before the court on:

1) defendants Andrew C. von Eschenbach, M.D., United States Food and Drug Administration ("FDA"), Michael O. Leavitt, and the Department of Health and Human Services's (collectively "the FDA defendants") motion to dismiss [docket no. 8 in case 1:05–cv–02083–GET];

2) the FDA defendants' motion for summary judgment [docket no. 22 in case 1:05–cv–02083–GET];

.3) plaintiff Hi–Tech Pharmaceuticals, Inc.'s ("Hi–Tech") motion for summary judgment [docket no. 32 in case 1:05–cv–02083–GET];

4) plaintiff United States of America's ("the government") motion for summary judgment [docket no. 27 in case 1:06–cv–00406–GET]; and

5) claimant and third-party plaintiff Hi–Tech's motion for summary judgment [docket no. 38 in case 1:06–cv–00406–GET].

Hi–Tech filed one of the instant actions, case 1:05–cv–02083–GET, on August 10, 2005, seeking relief from an FDA Final Rule declaring dietary supplements containing ephedrine alkaloids to be adulterated (the "Final Rule"). Hi–Tech manufactures, markets, distributes, and sells Lipodrene, a dietary supplement containing ephedrine alkaloids. Specifically, Hi–Tech seeks declaratory judgment that the Final Rule and defendants' actions are unlawful and in violation of Dietary Supplement Health and Education Act of 1994 and the Administrative Procedures Act and an order setting aside the Final Rule as void and granting injunctive relief prohibiting the enforcement of the Final Rule. On January 23, 2006, the FDA defendants filed a motion to dismiss in case 1:05–cv–02083–GET.

On February 22, 2006, the government filed a complaint for forfeiture of dietary supplement products and ingredients containing ephedrine alkaloids. The government contends that the products are liable to seizure and condemnation because they are adulterated within the meaning of the Federal Food, Drug and Cosmetic Act

("FDCA") 21 U.S.C. § 342(f)(1)(A), by presenting a significant or unreasonable risk of illness or injury under conditions of use recommended or suggested in labeling or, if the labeling does not discuss it, under ordinary conditions of use. On February 23, 2006, United States Marshals entered Hi–Tech's premises and seized the products.

On February 27, 2006, Hi–Tech filed a statement of interest in the forfeiture action as the sole owner and one of the persons entitled to the seized property. On the same date, Hi–Tech filed a third-party complaint in case 1:06–cv–00406–GET seeking declaratory judgment against the FDA, the Department of Health and Human Services ("HHS"), Andrew C. von Eschenbach, M.D., Acting Commissioner of FDA, and Michael O'Leavitt, Secretary of HHS. Hi–Tech alleges that the FDA Final Rule banning the sale of dietary supplements containing ephedrine alkaloids violates the FDA's statutory authority from the FDCA, as amended by the DSHEA and the APA, Section 706(2)(a)(c). Further, Hi–Tech alleges that the Final Rule is arbitrary and capricious under the APA, and that the third-party defendants violated Hi–Tech's due process rights. On February 27, 2006, Hi–Tech also filed a motion for preliminary injunction in case 1:06–cv–00406–GET seeking the return of the products seized on February 23, 2006. On March 13, 2006, the court denied Hi–Tech's motion for preliminary injunction.

Pursuant to an oral order on May 18, 2006, the court ordered the parties to file their motions for summary judgment within thirty days. The order also consolidated the two cases and stayed both cases and held in abeyance any pending motions until further order of the court. The order further directed the parties to notify the court when the Tenth Circuit Court of Appeals issued a ruling in *Nutraceutical*

*Corp. v. Von Eschenbach*, 459 F.3d 1033 (10th Cir.2006), *cert. denied*, —— U.S. ——, 127 S.Ct. 2295, 167 L.Ed.2d 1089 (2007).

The FDA defendants and the government filed their motion for summary judgment on July 10, 2006. Hi–Tech filed its motion for summary judgment on September 5, 2006. The parties jointly filed a notice of the outcome of the appeal to the Tenth Circuit Court of Appeals in *Nutraceutical*, 459 F.3d 1033.

### Motions for Summary Judgment

#### Standard

Courts should grant summary judgment when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must "always bear the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). That burden is "discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548; *see also U.S. v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir.1991).

Once the movant has met this burden, the opposing party must then present evidence establishing that there is a genuine issue of material fact. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The nonmoving party must go beyond the pleadings and submit evidence such as affidavits, depositions and admissions that are sufficient to demonstrate that if allowed to proceed to trial, a jury might return a verdict in his favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If he does so, there is a genuine issue of fact that requires a trial. In making a determination of whether there is a material issue of fact, the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. *Id.* at 255, 106 S.Ct. 2505; *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir.1987). However, an issue is not genuine if it is unsupported by evidence or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. *Id.* at 248, 106 S.Ct. 2505. Thus, to create a genuine issue of material fact for trial, the party opposing the summary judgment must come forward with specific evidence of every element essential to his case with respect to which (1) he has the burden of proof, and (2) the summary judgment movant has made a plausible showing of the absence of evidence of the necessary element. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

### Facts

In light of the foregoing standard, the court finds the following facts solely for the purpose of resolving these motions for summary judgment. On February 11, 2004, the FDA published the "Final Rule Declaring Dietary Supplements Containing Ephedrine Alkaloids Adulterated Because They Present an Unreasonable Risk" (the "Final Rule"), codified at 21 Fed.Reg. § 119.1. The Final Rule was enacted under the Dietary Supplement Health Education Act of 1994 ("DSHEA"), Pub.L. No. 103–417, 108 Stat. 4325 (1994), amending the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301–399, and pursuant to the FDA's general authority to issue regulations for the efficient enforcement of the Act, 21 U.S.C. § 371(a). In the Final Rule, the FDA declared that dietary supplements containing ephedrine alkaloids ("EDS") "present an unreasonable risk of illness or injury under the conditions of use recommended or suggested in labeling, or if no conditions of use are suggested or recommended in labeling, under ordinary conditions of use." The Final Rule became effective on April 12, 2004. The Final Rule bans the sale and distribution of all EDS.

Hi–Tech manufactures, produces, markets, distributes, and sells in interstate commerce EDS products, including Lipodrene, Stimerex–ES, and Betadrene. Hi–Tech's EDS consist in whole or in part of ingredients that are shipped in interstate commerce from outside the State of Georgia. The seized articles are dietary supplements, consisting of Hi–Tech's Lipodrene, Stimerex–ES, and Betadrene, and "various quantities of raw ingredients to make those products." Hi–Tech's Lipodrene, Betadrene, and Stimerex–ES each are labeled as containing 25 milligrams ("mg") "ephedrine group alkaloids" per tablet. Hi–Tech's Lipodrene and Betadrene are labeled for a dosage of two tablets—50 mg ephedrine alkaloids—per day. Hi–Tech's Stimerex–Es is labeled for a dosage of between three to four tablets—75–100 mg ephedrine alkaloids—per day.

### Discussion

### Hi–Tech's Motion for Summary Judgment

In its motion for summary judgment, Hi–Tech asserts that the FDA failed to comply with the requirements of the APA and the DSHEA when it issued the Final Rule. In particular, Hi–Tech argues that the FDA's notice failed to comply with specific guidance provided by Congress when it enacted the DSHEA. Hi–Tech further argues that the FDA's notice failed

to comply with the APA's requirements because the FDA failed to give notice of the terms and substance of the Final Rule in its 2003 Notice, failed to give notice that the FDA was considering adopting a new risk-benefit test, and failed to give notice that the FDA intended to absolutely prohibit EDS products. Finally, Hi–Tech argues that the Final Rule is not a logical outgrowth of the 2003 Notice.

■ Section 553 of the APA provides the procedures that federal government agencies must follow in rulemaking. 5 U.S.C. § 553. Section 553 requires agencies to give notice of proposed rulemaking in the Federal Register and further mandates that the notice include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). After providing proper notice, the agency must provide an opportunity for interested parties to comment. 5 U.S.C. § 553(c). "The notice need not specifically identify 'every precise proposal which [the agency] may ultimately adopt as a rule.'" *American Transfer & Storage Co. v. ICC*, 719 F.2d 1283, 1303 (5th Cir.1983) (citations omitted). "Rather, 'the proper test is whether the notice would fairly appraise interested persons of the subjects and issues the agency was considering.'" *United Steelworkers of Am. v. Schuylkill Metals*, 828 F.2d 314, 317 (5th Cir.1987) (citations omitted); *see also Ethyl Corp. v. EPA*, 541 F.2d 1, 48 (D.C.Cir.1976).

■ Once the agency has given proper notice and opportunity to comment to interested parties, the agency may modify its original proposed rule; "the rule is not required to 'remain frozen in its original vestigial form.'" *Schuylkill Metals*, 828 F.2d at 317 (citation omitted). If the agency does alter the proposed rule, it is not required to provide a new comment period "so long as the modified rule is a 'logical outgrowth of the published pro-

ceedings.'" *Id.* (citations omitted); *see also Beirne v. Sec'y of Dep't of Agric.*, 645 F.2d 862, 865 (10th Cir.1981) ("It is a well settled and sound rule which permits administrative agencies to make changes in the proposed rule after the comment period without a new round of hearings.") (citation omitted). This principle is limited insomuch as the changes must be in "'character with the original scheme and (be) foreshadowed in proposals and comments advanced during the rulemaking.'" *Beirne*, 645 F.2d at 865 (quoting *South Terminal Corp. v. EPA*, 504 F.2d 646, 658 (1st Cir.1974)).

The Senate Conference Report to the DSHEA states that when the FDA utilizes its power under the DSHEA to determine that a dietary supplement is adulterated, "the FDA would publish a notice in the Federal Register proposing to declare a dietary supplement adulterated and setting forth the basis for their position that a substantial and unreasonable risk of illness or injury is presented." S.Rep. No. 103–410, at 35 (1994) (Conf.Rep.). The Report goes on to state that the FDA would be obligated to describe in the notice "how such risks are presented under 'the conditions of use recommended or suggested in labeling'" so that the FDA could consider "whether certain conditions of use would not present a substantial and unreasonable risk of illness or injury." *Id.* After the comment period, "the FDA could then establish by regulation that a dietary supplement would be adulterated if it contained an ingredient at all or at levels which present a substantial or unreasonable risk." *Id.*

The June 4, 1997 proposed rule issued by the FDA entitled "Dietary Supplements Containing Ephedrine Alkaloids," 62 Fed. Reg. 30678, outlines the FDA's proposal of a finding regarding dietary supplements containing 8 milligrams or more of ephed-

rine alkaloids. 62 Fed.Reg. at 30678. The proposed rule states that in light of the number of reports of adverse events associated with the use of EDS, the FDA convened its Food Advisory Committee ("FAC") to review and provide final recommendations on the FDA's policy regarding EDS. 62 Fed.Reg. at 30680. While the FAC agreed that the FDA needed to take action to address the public health concerns associated with the use of EDS, it could not come to consensus on what action the FDA should take. *Id.* "Over half of the Food Advisory Committee members stated that, based on the available data, no safe level of ephedrine alkaloids could be identified for use in dietary supplements." *Id.* The proposed rule also states that the Working Group of the FDA's FAC concluded that the available information on EDS contains sufficient evidence to demonstrate that the use of EDS may cause serious adverse events for consumers. 62 Fed.Reg. at 30691. On this basis, the FDA's proposed rule states:

> FDA tentatively concludes that there is a consistent, large, and growing body of evidence that establishes a causal association between the use of ephedrine alkaloids and subsequent adverse events. The agency also tentatively concludes that the use of ephedrine alkaloid-containing dietary supplements is associated with a serious and significant public health concern because of the nature of the adverse events and the size of the population at risk.

*Id.*

In light of the risks that the FDA found EDS to pose to the public, the FDA's proposed rule discusses possible remedies, including restriction of the level of ephedrine alkaloids in dietary supplements. 62 Fed.Reg. at 30692. With regard to levels, the proposed rule notes that the information available did not "provide sufficient data to adequately evaluate risk below approximately 10 mg per serving." 62 Fed.

Reg. at 30693. "Given the available evidence," the proposed rule continues, "it is difficult to ascertain whether there is a threshold level of ephedrine alkaloids below which the general population and susceptible individuals will not experience serious adverse events." *Id.* Based on the available evidence, "the agency tentatively concludes that the use of dietary supplements containing 8 mg or more ephedrine alkaloids per serving may render the dietary supplement injurious to health." *Id.*

In light of its tentative conclusion, the FDA outlined a proposed rule which, among other things, "states that dietary supplements that contain 8 mg or more ephedrine alkaloids ... per single serving shall be deemed to be adulterated under section 402(a)(1) and (f)(1)(A)" of the DSHEA. *Id.* In explaining its determination of 8 mg as the deciding level, the FDA states that 8 mg and above "represent levels at which the presence of ephedrine alkaloids in a dietary supplement may render the product injurious to health and presents a significant and unreasonable risk. FDA cannot say that it is a safe level, nor has it been arrived at in a way that factored in some margin of safety." 62 Fed.Reg. at 30693–30694. The proposed rule continues:

> Given the seriousness of the public health concerns and the uncertainty surrounding the risks attendant upon consumption of ephedrine alkaloids below 8 mg per serving, the agency solicits comments, and asks that they include data, particularly clinical data, on the safety of the use of less than 8 mg of ephedrine alkaloids per serving in dietary supplements. Should data and information become available that demonstrate that the use of less than 8 mg of ephedrine alkaloids per serving in dietary supplements pose a hazard to the public health, or that the level of ephedrine alkaloids that will render a product adulterated is

higher than 8 mg per serving, the agency will consider modifying [its proposed Rule] accordingly.

62 Fed.Reg. at 30694. In addition to the proposed course of action, the FDA discusses several other options, including an outright ban of EDS. 62 Fed.Reg. at 30711.

The comment period for the June 4, 1997 proposed rule closed on August 18, 1997. In a notice issued in the Federal Register on August 20, 1997, the FDA announced its intent to reopen the comment period after the agency corrected inadvertent omissions in the administrative record. 62 Fed.Reg. 44247. On September 18, 1997, the FDA reopened the comment period for an additional seventy-five (75) days until December 2, 1997. 62 Fed. Reg. 48968.

On April 3, 2000, the FDA issued a notice in the Federal Register, entitled "Dietary Supplements Containing Ephedrine Alkaloids; Withdrawal in Part," 65 Fed.Reg. 17474, announcing that the FDA was withdrawing certain provisions of the 1997 proposed rule regarding EDS. In particular, noting that additional information became available after it issued the 1997 proposal, the FDA withdrew "the provisions of the ephedrine alkaloids proposal relating to the dietary ingredient level and duration of use limit for these products," including the tentative conclusion that a dietary supplement is adulterated if it contains 8 mg or more of ephedrine alkaloids per serving. 65 Fed.Reg. at 17475. The FDA stated that "[t]his action will allow FDA to reconsider, with public input, whether any dietary ingredient level or duration of use limit for these products is appropriate or whether alternative measures should be considered." *Id.* The notice further states that the FDA was requesting the following response:

[P]ublic input about the significance of new information collected by the agency about the safety of dietary supplements containing ephedrine alkaloids .... [and] the submission of any other information that the submitters believe is relevant to such a safety assessment. Should additional information suggest that additional action is necessary, FDA will consider what action is appropriate, and take appropriate steps to protect consumers and the public health.

65 Fed.Reg. at 17476.

On March 5, 2003, the FDA issued an additional notice in the Federal Register, entitled "Dietary Supplements Containing Ephedrine Alkaloids; Reopening of the Comment Period," 68 Fed.Reg. 10417, which reopened the comment period for the June 4, 1997 Proposed Rule for thirty (30) days. The notice states that more scientific evidence had come to light concerning the risks posed by EDS, and that in light of this evidence, the FDA intended to consider whether the "FDA should determine that dietary supplements containing ephedrine alkaloids present a 'significant or unreasonable risk of illness or injury under conditions of use recommended or suggested in labeling, or if no conditions of use are suggested or recommended in the labeling, under ordinary conditions of use.'" 68 Fed.Reg. at 10418–10419 (quoting 21 U.S.C. § 342(f)(1)(A)). In the Final Rule, 69 Fed.Reg. 6788, issued February 11, 2004, the FDA concluded that EDS "are adulterated under section 402(f)(1)(A) (21 U.S.C. 342(f)(1)(A)) of the act because they present an unreasonable risk of illness or injury under the conditions of use recommended or suggested in labeling, or if no conditions or use are suggested or recommended in labeling, under ordinary conditions of use." 68 Fed.Reg. at 6788.

■ Based on the administrative record outlined above, the court concludes that the FDA complied with the requirements

of both the APA and the DSHEA. Specifically, with regard to the APA, the court finds that the FDA provided sufficient notice that it intended to regulate EDS under 21 U.S.C. § 342(f)(1)(A) and that the Final Rule is a logical outgrowth of the proposed rule. In its initial notice in 1997, the FDA indicated that it was unable to ascertain the threshold level at which EDS could be consumed safely by consumers. While the FDA's proposed rule addressed dietary supplements containing 8 mg or more of ephedrine alkaloids, the notice goes on to state that if data and information became available indicating that the use of dietary supplements containing less than 8 mg of ephedrine alkaloids was unsafe, the FDA would consider modifying the proposed rule accordingly. The 1997 notice also mentions the option of banning EDS all together.

The 2000 notice indicated that due to new information received by the FDA, it was withdrawing the proposed rule banning dietary supplements containing 8 mg or more of ephedrine alkaloids to allow the FDA to consider whether *any* level of use of EDS was appropriate. The 2003 notice specifically states that, in light of additional information received by the FDA, it would consider whether the FDA should find that all EDS are adulterated pursuant to the DSHEA. The comments submitted to the FDA regarding the use of a risk-benefit analysis to find all EDS adulterated, while not determinative of the adequacy of the FDA's notice, further provide support for the court's finding that the Final Rule was a logical outgrowth of the proposed rule. *See Shell Oil Co. v. EPA,* 950 F.2d 741, 757 (D.C.Cir.1991) (holding that comments submitted based on agency's written notice can provide evidence of public notice). Based on the administrative record from 1997 through 2003, the Final Rule was a foreseeable result of the 1997 proposed rule because interested parties were adequately put on notice that the

FDA might ban EDS entirely. *See, e.g., Am. Iron & Steel Institute v. OSHA,* 182 F.3d 1261, 1276 (11th Cir.1999) (finding final rule which eliminated some federally mandated roles for physicians by expanding the role for non-physician health care professionals was a logical outgrowth of draft standards which asked for comments on the extent of the role that should be given to non-physician health professionals).

■ Hi–Tech also argues that the FDA failed to give notice that it was considering using a new risk-benefit analysis test, which Hi–Tech argues is a substantive rule. The APA's notice and comment requirements apply to substantive rules established through agency rulemaking, but do not apply to interpretive rules. *See* 5 U.S.C. § 553(b). Substantive rules are those that implement statutes and have the force and effect of law. *Chrysler Corp. v. Brown,* 441 U.S. 281, 302, n. 31, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979) (quoting Attorney General's Manual on the Administrative Procedure Act 30, n. 3 (1947)). "Interpretive rules are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'" *Id.*

■ The court finds that the risk-benefit analysis utilized by the FDA in determining whether EDS products are adulterated is an interpretive rule, and thus the FDA was not required to abide by the APA's notice and comment requirements in utilizing the analysis. In applying the risk-benefit analysis, the FDA was interpreting the phrase "unreasonable risk" in the DSHEA for the first time, and it was within the FDA's inherent authority to interpret the statutory terms under the Act. In announcing its interpretation of "unreasonable risk," the FDA did not create new rights or duties, and thus it is not a substantive rule. *See General Motors*

*Corp. v. Ruckelshaus,* 742 F.2d 1561, 1565 (D.C.Cir.1984)

■ The court further finds that the plain meaning of the phrase "unreasonable risk" in the DSHEA requires a risk-benefit analysis. The DSHEA states that dietary supplements shall be deemed adulterated when they present "a significant *or* unreasonable risk of illness or injury." 21 U.S.C. § 342(f)(1)(A) (emphasis added). In interpreting this phrase, the FDA found that the word "unreasonable" "connotes comparison of the risks and benefits of the product" and that "Congress unambiguously intended that an assessment of 'unreasonable risk' in the dietary supplement context should entail a risk-benefit analysis." 69 Fed.Reg. at 6823. Utilizing the risk-benefit analysis, the FDA declared "dietary supplements containing ephedrine alkaloids to be adulterated" because they "present an unreasonable risk of illness or injury." 69 Fed.Reg. at 6788.

■ In reviewing the FDA's construction of the DSHEA, two questions arise: First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also Cadet v. Bulger,* 377 F.3d 1173, 1185 (11th Cir.2004). An agency's interpretation will be found reasonable "so long as it is not 'arbitrary, capricious, or manifestly contrary to the statute.'" *Mahon v. United States Dep't of Agric.,* 485 F.3d 1247, 1258 (11th Cir.2007) (quoting *Dawson v. Scott,* 50 F.3d 884, 887 (11th Cir.1995)); *see also* 5 U.S.C. § 706(2)(A) ("The reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.").

After considering the parties' arguments and the record provided, the court finds that Congress unambiguously required the FDA to utilize the risk-benefit analysis under the DSHEA. "The plain language of the statute directs the FDA to restrict distribution of dietary supplements which pose any risk that is unreasonable in light of its potential benefits." *Nutraceutical,* 459 F.3d at 1038; *see also Merck KGaA v. Integra Lifesciences I, Ltd.,* 545 U.S. 193, 203, 125 S.Ct. 2372, 162 L.Ed.2d 160 (2005) (finding that phrase "unreasonable risk" in other provisions of the FDCA "involves a comparison of the risks and the benefits"). In making this determination, the court utilizes two well-established rules of statutory construction: first, "we must construe the statute to give effect, if possible, to every word and clause," and second, "in determining the proper interpretation of a statutory provision, we must view the provision in the context of the statute as a whole." *Lowery v. Ala. Power Co.,* 483 F.3d 1184, 1204 (11th Cir.2007).

Under the terms of the statute, a dietary supplement is adulterated when it presents "a significant or unreasonable risk of illness *or* injury." 21 U.S.C. § 342(f)(1)(A) (emphasis added). Accordingly, the terms "significant" and "unreasonable" must have independent meanings. *Nutraceutical,* 459 F.3d at 1039–40. "The

plain meaning of a 'significant risk' is a great danger." *Id.* at 1040. An "unreasonable risk" contemplates a balancing of the risks involved with EDS versus the benefits, as a risk could be significant and yet reasonable if the benefits were large enough to outweigh the risks. *Id.* (citing 69 Fed.Reg. at 6823).

While the FDA's decision to ban all EDS products is a substantive rule and thus subject to the APA's notice and comment requirements, the FDA's interpretation of "unreasonable risk" in the DSHEA is not a substantive rule and the FDA was not required to provide notice and comment period for its use of the risk-benefit analysis. In addition, with regard to Hi–Tech's argument that the FDA did not comply with the requirements as outlined in the Senate Committee Report for the DSHEA, the court finds that the FDA complied with the requirements listed in the Senate Report, as they mirror what is required under the APA.

Accordingly, the court DENIES plaintiff Hi–Tech Pharmaceuticals, Inc.'s motion for summary judgment [docket no. 32 in case 1:05–cv–02083–GET] and claimant and third-party plaintiff Hi–Tech Pharmaceuticals, Inc.'s motion for summary judgment [docket no. 38 in case 1:06–cv–00406–GET].

### Government's Motion for Summary Judgment

The government seeks summary judgment in its forfeiture action (case 1:06–cv–00406–GET) on the basis that the seized articles are adulterated and held for sale after shipment in interstate commerce, within the meaning of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 342(f)(1)(A). The government asserts that it is undisputed that:

(1) the seized articles are dietary supplements; (2) the seized finished products are labeled as containing 25 milligrams ("mg") ephedrine alkaloids per tablet and do contain ephedrine alkaloids; (3) the seized finished products are labeled for a daily dose between 50 and 100 mg per day; (4) the seized raw materials are ingredients used to manufacture the finished EDS; and (5) Hi–Tech holds the seized articles for sale after shipment of one or more of their ingredients in interstate commerce.

The government maintains that the only issue presented on summary judgment is "whether the seized articles are adulterated under 21 U.S.C. § 342(f)(1)(A) because they present an unreasonable risk of illness or injury under their labeled conditions of use."

Claimant and third-party plaintiff Hi–Tech presents several arguments in opposition to the government's motion for summary judgment in the forfeiture action. First, Hi–Tech argues that the Final Rule violates the DSHEA by creating a new risk-benefit test to determine whether dietary supplements present a significant or unreasonable risk of illness or injury. Hi–Tech argues that the risk-benefit test vitiates Congress's intent in passing the DSHEA and ignores the government's burden of proof to show adulteration under the DSHEA. The government responds by arguing that the DSHEA unambiguously requires a risk-benefit analysis.

■■■ In deciding Hi–Tech's motion for summary judgment, the court has already determined that the DSHEA required the FDA to utilize the risk-benefit analysis to determine whether a risk is unreasonable. The court further finds that the record does not support Hi–Tech's allegation that the FDA's use of risk-benefit analysis shifts the government's burden of proof from the FDA to dietary supplement manufacturers. "Rather, the FDA has assumed its responsibility of gathering data, soliciting comments, and conducting the risk-benefit analysis." *Id.* at 1039. The

FDA properly conducted the risk-benefit analysis after receiving comments on the proposed rule and reviewing numerous scientific reports. *See* 69 Fed.Reg. at 6788 (noting that the FDA considered "(1) [t]he well-known, scientifically established pharmacology of ephedrine alkaloids; (2) peer-reviewed scientific literature on the effects of ephedrine alkaloids; and (3) the adverse events (including published case reports) reporting to have occurred following consumption of dietary supplements containing ephedrine alkaloids."). The FDA considered the "known and reasonably likely benefits" of EDS in issuing the Final Rule, which are benefits that are "supported by a meaningful totality of the evidence, given the current state of scientific knowledge." 69 Fed.Reg. at 6798. Thus, the burden remained with the FDA to show that the risks associated with EDS outweighed the benefits, thereby making EDS adulterated.

Hi–Tech also argues that the Final Rule violates the DSHEA's requirements that adulteration be proven under labeled conditions of use. The DSHEA defines an adulterated dietary supplement as one that "presents a significant or unreasonable risk of illness or injury under" either "conditions of use recommended or suggested in labeling," or "if no conditions of use are suggested or recommended in the labeling, under ordinary conditions of use." 21 U.S.C. § 342(f)(1)(A)(I) and (ii). Hi–Tech suggests that by banning all EDS outright, the FDA diminished its burden of proof to show adulteration under conditions of use recommended or suggested in labeling. The government responds by arguing that there is sufficient evidence in the record to demonstrate by a preponderance of the evidence that EDS at any dose level pose an unreasonable risk.

The court finds that the FDA met its burden of proof by showing by a preponderance of the evidence that dietary supplements containing *any* dosage of ephedrine alkaloids present a significant or unreasonable risk of illness or injury. In the Final Rule, the FDA outlined the following in support of its ban of EDS:

> Multiple studies demonstrate that dietary supplements containing ephedrine alkaloids, like other sympathomimetics, raise blood pressure and increase heart rate. These products expose users to several risks, including the consequences of increased blood pressure (*e.g.*, serious adverse events such as stroke, heart attack, and death) and increased morbidity and mortality from worsened heart failure and pro-arrhythmic effects. Based on the best available scientific data and the known pharmacology of ephedrine alkaloids and similar compounds, we conclude that dietary supplements containing ephedrine alkaloids pose short-term and long-term risks. This is clearest in long-term use, where sustained increased blood pressure in any population will increase the risk of stroke, heart attack, and death, but there is also evidence of risk from shorter-term use in patients with heart failure or underlying coronary artery disease.

69 Fed.Reg. at 6789. The FDA went on to state that based on the evidence before it, the benefits of EDS did not outweigh the risks. *Id.*

As the review of scientific literature is properly within the province of the FDA, the court grants deference to the FDA's findings based on its expertise. *Nutraceutical*, 459 F.3d at 1043; *see also Weinberger v. Bentex Pharms., Inc.*, 412 U.S. 645, 653–54, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973) (finding that the FDA is "peculiarly suited" to evaluate scientific reports, a matter "not ... well left to a court without chemical or medical background," because it "necessarily implicates complex chemical and pharmacological considerations."). The evidence in the administrative record

supports the FDA's finding that the risks of EDS, when used for their labeled indications or under ordinary conditions of use, outweigh the benefits of these products. The Final Rule outlines the FDA's analysis in evaluating the risks and weighing the risks against the benefits, "giv[ing] more weight to benefits that improve health outcomes, especially in the long term, than to benefits that are temporary or rely on subjective measures such as feeling or looking better." 69 Fed.Reg. at 6799. Accordingly, the court finds that the evidence presented in the Final Rule is sufficient to show by a preponderance of the evidence that EDS at any level, regardless of the conditions of use recommended or suggested in labeling, pose an unreasonable risk, and therefore the Final Rule does not violate the DSHEA.

Hi–Tech further argues that the Final Rule is based upon arbitrary and capricious findings in that the FDA minimized, disregarded, or misconstrued the scientific evidence of the benefits of EDS and exaggerated the scientific evidence of the risks underlying EDS. Hi–Tech also argues that the FDA approved the label for Hi–Tech's Lipodrene product and cannot prove that the product is adulterated under the label. The government responds by arguing that the conclusions in the Final Rule are fully supported by scientific evidence.

■■■■■ The APA requires courts to set aside agency regulations found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A court "may not set aside an agency rule that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). In reviewing an agency's action under the APA, the court's review is narrow and a rule may only be found arbitrary and capricious where

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 43, 103 S.Ct. 2856.

■■■■■ Under this deferential standard of review, the court finds that the FDA did not act in an arbitrary and capricious manner in enacting the Final Rule. *See also Nutraceutical,* 459 F.3d at 1043 ("The FDA was not arbitrary or capricious in its Final Rule."). In making rules, agencies have a responsibility "to remain consistent with the government legislation." *Morton v. Ruiz,* 415 U.S. 199, 232, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). The court already has found that the DSHEA required the FDA to use a risk-benefit analysis and that the FDA has shown by a preponderance of the evidence that EDS at any level pose an unreasonable risk of illness or injury, which lends support to the court's conclusion that the FDA did not act in an arbitrary and capricious manner.

Hi–Tech argues that the FDA minimized and disregarded the benefits associated with EDS, including weight loss. The FDA, however, acknowledged the main benefit of EDS to be a modest short-term weight loss, but concluded that the risks, including short-term risks of raised blood pressure and increased heart rate and long-term risks of stroke, heart attack, and death, were sufficient to outweigh the short-term weight loss benefits of EDS. 69 Fed.Reg. at 6789. This finding was partially based on the FDA's conclusions that "the evidence supports only a modest

short-term weight loss, insufficient to positively affect cardiovascular risk factors or health conditions associated with being overweight or obese." *Id.* The FDA further concluded that even if there were long-term weight loss benefits associated with EDS, these benefits could not mitigate the long-term risks associated with EDS. *Id.* Contrary to Hi–Tech's assertion, the administrative record does not support a finding that the FDA downplayed the benefits associated with EDS or that the FDA acted in an irrational manner in its balancing of the risks and benefits of EDS.

Further, the court rejects Hi–Tech's contention that the FDA exaggerated the risks associated with EDS, as the Final Rule is replete with references to studies and other scientific evidence outlining the serious risks associated with EDS. *See, e.g.,* 69 Fed.Reg. at 6788, 6791, 6798–799, 6800–811. Hi–Tech takes issue with the FDA's reliance on a report commissioned by the National Institutes of Health by the Southern California Evidenced Based Practice Center (the "RAND Report") and adverse event reports ("AERs") and the FDA's alleged dismissal of a review of EDS by the CANTOX Health Sciences International ("CANTOX") and other studies outlining benefits of EDS. The court cannot say that any of Hi–Tech's arguments support a finding that the FDA's Final Rule banning EDS runs counter to the evidence before the agency or that it acted in an arbitrary or capricious manner in issuing the Final Rule. As previously noted, the court grants deference to the FDA's findings based on its expertise in the medical arena, and the evidence presented is insufficient for the court to conclude that the FDA Final Rule runs counter to the evidence before the agency. Rather, it appears that the FDA and Hi–Tech have a difference in view of the evidence of the risks and benefits of EDS, but the court cannot say that the difference in parties' views is arbitrary or capricious.

Finally, Hi–Tech argues that the Final Rule does not function as law in the present proceeding. Hi–Tech bases this argument on the language of 21 U.S.C. § 342(f), which states:

A food shall be deemed to be adulterated—

(f) Dietary supplement or ingredient: safety.

(1) If it is a dietary supplement or contains a dietary ingredient that—

(A) presents a significant or unreasonable risk of illness or injury under—

(i) conditions of use recommended or suggested in labeling, or

(ii) if no conditions of use are suggested or recommended in the labeling, under ordinary conditions of use;

(D) is or contains a dietary ingredient that renders it adulterated under paragraph (a)(1) under the conditions of use recommended or suggested in the labeling of such dietary supplement.

In any proceeding under this subparagraph, the United States shall bear the burden of proof on each element to show that a dietary supplement is adulterated. The court shall decide any issue under this paragraph on a de novo basis.

21 U.S.C. § 342(f). Hi–Tech argues that in an enforcement proceeding under the statute, the government may not rely on the Final Rule as the legal basis for the seizure and cannot meet its burden to prove that the particular products are adulterated under the DSHEA simply by citing to the Final Rule. Rather, Hi–Tech argues that the government must prove that a seized product is adulterated with the presentation of original evidence. The government responds by noting that while 21 U.S.C. § 342(f) permits the court to review *de novo* certain issues, where the government is proceeding under an FDA regulation declaring a product adulterated, the regulation has the force of law and it is

no longer for the court to decide the issue of adulteration on a *de novo* basis.

The issue before the court appears to be one of first impression. While two courts have found that the *de novo* standard applies in enforcement proceedings brought by the government, no court has specifically determined what issues are entitled to *de novo* review under 21 U.S.C. § 342(f). *See NVE, Inc. v. HHS*, 436 F.3d 182, 192 (3rd Cir.2006) ("Thus, application of the de novo standard, like the burden of proof provision, is limited to enforcement actions brought by the United States"); *Nutraceutical*, 459 F.3d at 1037 ("As such, it is appropriate to limit the de novo standard of review, which afford the FDA no deference, to enforcement proceedings."). There are also no other statutes that have similar language for the court to compare to the statute in question. Thus, the court is left to review the legislative history of the DSHEA and the provision at issue and utilize rules of statutory construction to determine whether the court must review the issue of adulteration in the present case on a *de novo* basis.

A review of the legislative history surrounding the "de novo review" provision of 21 U.S.C. § 342(f) reveals that the intent of Congress was "to codify current law that the government bear the burden of proving dietary supplements adulterated." S.Rep. No. 103–410, at 38 (1994). "The government must produce the preponderance of the evidence as to harmful effects from the dietary supplement when used as recommended and suggested in labeling." *Id.* The history cites to *United States v. 71/55 Gallon Drums of Stuffed Green Olives*, 790 F.Supp. 1379 (N.D.Ill.1992), a case where the FDA filed a forfeiture action of seventy-one 55 gallon drums of stuffed green olives in brine, pursuant to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq*. In that case, unlike the present case,.there was no FDA regulation declaring the green olives at issue adulterated. The court in *71/55 Gallon Drums of Stuffed Green Olives* held that the burden of proof rested on the government to establish by a " 'fair preponderance of the evidence' that the article of food is adulterated within the meaning of § 342(a)(3)." 790 F.Supp. at 1382.

 In light of the history provided, the court finds that the proper reading of the *de novo* review language contained in 21 U.S.C. § 342(f) is that where the government is proceeding in a forfeiture action alleging that a dietary supplement is adulterated and has the support of a valid regulation declaring the supplement in question adulterated, then the court must defer to the agency's regulation and should not review anew the question of adulteration. In forfeiture actions where the government does not have the benefit of a valid FDA regulation to support its contention that the seized dietary supplement at issue is adulterated, then the government bears the burden of proof to establish by a preponderance of the evidence that the article is adulterated within the meaning of the DSHEA. Reading the statute any other way would make FDA regulations worthless in a forfeiture action and the court cannot find that it was Congress' intent to do so. It is also noteworthy that, regardless of whether 21 U.S.C. § 342(f) requires the court to decide the adulteration issue on a *de novo* basis, the court already has found that the FDA established by a preponderance of the evidence that any dosage of EDS presents a significant or unreasonable risk of illness or injury, and therefore are properly considered adulterated under the DSHEA.

 As the issue of adulteration has been decided, the court finds that summary judgment in the government's favor is warranted because the remaining issues, that the articles seized in the present action are dietary supplements, that the

seized finished products are labeled as containing 25 mg ephedrine alkaloids per tablet and do contain ephedrine alkaloids, that the seized finished products are labeled for a daily dose between 50 and 100 mg per day, that the seized raw materials are ingredients used to manufacture the finished EDS, and that Hi–Tech holds the seized articles for sale after shipment of one or more of their ingredients in interstate commerce, are not disputed by Hi–Tech. *See* 21 U.S.C. § 334 (outlining grounds and jurisdiction for seizure of an article of food, drug, or cosmetic that is adulterated). Accordingly, the court finds that no genuine issue of material fact exists for trial, and hereby GRANTS the FDA defendants [docket no. 22 in case no. 1:05–cv–02083–GET] and the government's [docket no. 27 in case no. 1:06–cv–00406–GET] motions for summary judgment [docket no. 22, 27].

### Government's Motion to Dismiss

On January 23, 2006, the FDA defendants filed a motion to dismiss Hi–Tech's complaint. As the court has found that summary judgment is appropriate in favor of the FDA defendants, the court DENIES AS MOOT the FDA defendants' motion to dismiss [docket no. 8 in case no. 1:05–cv–02083–GET].

#### Summary

1) Defendants Andrew C. Von Eschenbach, M.D., United States Food and Drug Administration, Michael 0. Leavitt, and the Department of Health and Human Services's motion to dismiss [docket no. 8 in case no. 1:05–cv–02083–GET] is **DENIED AS MOOT;**

2) Defendants Andrew C. von Eschenbach, M.D., United States Food and Drug Administration, Michael O. Leavitt, and the Department of Health and Human Services's motion for summary judgment [docket no. 22 in case no. 1:05–cv–02083–GET] is **GRANTED;**

3) Plaintiff Hi–Tech Pharmaceuticals, Inc.'s ("Hi–Tech") motion for summary judgment [docket no. 32 in case no. 1:05–cv02083–GET] is **DENIED;**

4) Plaintiff United States of America's motion for summary judgment [docket no. 27 in case no. 1:06–CV–00406–GET] is **GRANTED;** and

5) Claimant and third-party plaintiff Hi–Tech's motion for summary judgment [docket no. 38 in case no. 1:06–CV–00406–GET] is **DENIED.**

**SO ORDERED.**